**Opinion issued June 28, 2012**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-09-01141-CV**

———————————

**UNION CARBIDE CORPORATION, Appellant**

**V.**

**DAISY E. SYNATZSKE AND GRACE ANNETTE WEBB, INDIVIDUALLY AND AS REPRESENTATIVES AND CO-EXECUTRIXES OF THE ESTATE OF JOSEPH EMMITE, SR., JOSPEH EMMITE, JR., DOROTHY A. DAY, VERA J. GIAMALVA AND JAMES R. EMMITE, Appellees**

---

**On Appeal from the 11th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2007-43950**

---

**DISSENTING OPINION**

I respectfully dissent from this Court's en banc judgment affirming the trial

court's order denying Union Carbide Corporation's ("Union Carbide") motion to

dismiss[1] the claims of Daisy E. Synatzke and Grace Annette Webb, individually and as representatives and co-executrixes of the estate of Joseph Emmite, Sr., Joseph Emmite, Jr., Dorothy Day, Vera J. Gialmalva, and James R. Emmite (collectively, "the Emmites"), in the Emmites' wrongful-death suit against Union Carbide for the death of Joseph Emmite, Sr. ("Joseph").

I join parts I, II, III, and IV of the En Banc Opinion. I agree with the plurality's construction of Civil Practice and Remedies Code Chapter 90, set out in part IV of the plurality opinion, and I disagree with the concurring justices' construction of Chapter 90. However, I disagree with the plurality's conclusion that Chapter 90 is unconstitutional as applied to the Emmites' claims in this case. I believe that the statute is constitutional as applied here and that it worked in this case exactly as the Texas Legislature intended it to work: to bar a suit for damages for wrongful death brought by the heirs of an asbestos worker who remained functionally and physically unimpaired from undiagnosed asbestosis until his death at the age of eighty-five.

Thus, I agree with the plurality's holding that the trial court erred in finding that the Emmites satisfied Civil Practice and Remedies Code section 90.010[2] through the provision of Dr. Prince's reports. This is because, as stated in the

---

[1]     *See* TEX. CIV. PRAC. & REM. CODE ANN. § 90.007 (Vernon 2011).

[2]     *See id.* § 90.010 (Vernon 2011).

plurality opinion, I conclude that section 90.010(f)—which the parties refer to as the "safety valve"—may only be reasonably interpreted as requiring a plaintiff claiming non-cancerous asbestos-related impairment to substantiate his claim of impairment with pulmonary function testing that is relevant to his diagnosis. I, therefore, disagree with the concurring opinion, which reads each subparagraph of section 90.010(f) separately and finds its requirements satisfied by a pulmonary function test that was performed forty years before Joseph's death from "possible asbestosis" and that showed no impairment at that time.

When the statute is read as a whole, it is obvious to me that a plaintiff cannot meet any of the statutory reporting requirements of section 90.010, including the relaxed requirements under the safety-valve provision, by providing "historic" results from a test that was performed forty years prior to any allegation of impairment and an accompanying diagnosis. Simply put, when the results of "historic" or "ancient" pulmonary function testing submitted by a plaintiff are completely and indisputably irrelevant to the impairment for which a plaintiff is seeking recovery, a plaintiff has not satisfied the safety-valve provision.

However, I cannot join the plurality's holding that, because section 90.010(f) requires a plaintiff to undergo pulmonary function testing that is relevant to a diagnosis of impairment and Joseph was too weak to take such a test a month before his death, section 90.010(f) is unconstitutional as applied to bar the

3

Emmites' wrongful-death claims retroactively. Rather, I would hold that, properly applied, the statute would function under the circumstances presented by this case exactly as the legislature intended: namely, to bar claims against limited asbestosis funds by the heirs of an asbestos worker who suffered no functional or physical disability during his lifetime due to a diagnosed pulmonary disease shown by a pulmonary function test and other evidence to be asbestos-related. I believe, in accord with recent, controlling precedent from the Texas Supreme Court, that the legislature enacted Chapter 90 to serve the "compelling public interest" of protecting limited funds available to compensate the victims of asbestos-related diseases, as evidenced by its detailed findings, and that this compelling public interest, under the circumstances presented in this case, overcomes "the heavy presumption against retroactive laws." *See Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 146 (Tex. 2010). Therefore, I would hold that section 90.010(f) is constitutional as applied in this case.

### A.    *Safety-Valve*

Although I agree with and fully join the reasoning set forth by the plurality concerning its interpretation of the pulmonary function testing requirement in the safety-valve provision, I write separately to emphasize one point with respect to the requirements of Chapter 90.

4

Section 90.003 prescribes the filing of a report when a claimant asserts an asbestos-related injury, and it requires, among other things, a report by a physician that "verifies that the exposed person has asbestos-related pulmonary impairment as demonstrated by pulmonary function testing" that shows certain objective measurements. TEX. CIV. PRAC. & REM. CODE ANN. § 90.003(a)(2)(D) (Vernon 2011). Section 90.010, the safety-valve provision, prescribes an alternative method to satisfy Chapter 90's report requirement for a claimant asserting an asbestos-related injury. *Id.* § 90.010(f)(1) (Vernon 2011). Although the safety-valve provision omits some of the specific objective measurements that must be shown in a report pursuant to section 90.003,[3] it still requires many of the same things required by section 90.003, including the performance of a relevant pulmonary function test. *See id.* § 90.010(f)(1)(B)(ii). Specifically, even the less-stringent safety-valve provision requires a report by a physician verifying that:

(i) the physician making the report has a physician-patient relationship with the exposed person;

---

[3] For example, under section 90.003, the report must verify that the exposed person has asbestos-related pulmonary impairment as demonstrated by pulmonary function testing and the testing must show "forced vital capacity below the lower limit of normal or below 80 percent of predicted and FEV1/FVC ratio (using actual values) at or above the lower limit of normal or at or above 65 percent" or "total lung capacity, by plethysmography or timed gas dilution, below the lower limit of normal or below 80 percent of predicted[.]" *Id.* § 90.003(a)(2)(D) (Vernon 2011).

(ii)	*pulmonary function testing has been performed on the exposed person and the physician making the report has interpreted the pulmonary function testing*;

(iii)	the physician making the report has concluded, to a reasonable degree of medical probability, that the exposed person has radiographic, pathologic, or computed tomography evidence establishing bilateral pleural disease or bilateral parenchymal disease caused by exposure to asbestos . . . ; and

(iv)	the physician has concluded that the exposed person has asbestos-related . . . physical impairment comparable to the impairment the exposed person would have had if the exposed person met the criteria set forth in Section 90.003 or 90.004[.]

*Id.* § 90.010(f)(1)(B) (emphasis added).

When the statute is considered as a whole, it is clear that, although the legislature relaxed a number of objective measurements required in a section 90.003 report, the legislature retained in the safety-valve provision the requirement that pulmonary function testing be performed on the plaintiff claiming impairment and, necessarily, that such testing be relevant to the impairment diagnosis. Although our concurring colleagues state that "[p]ro forma compliance with the statute is undisputedly present," this proposition is certainly disputed by Union Carbide, as well as by the original panel. I agree with the original panel. In my view, allowing a plaintiff to satisfy the safety-valve's pulmonary function testing requirement by referring to testing results obtained over forty years before the plaintiff made any claim of an asbestos-related impairment disregards the plain

6

language of the statute and frustrates the unmistakable purpose of Chapter 90, to which I now turn. *See id.* § 90.010(f)(1)(B)(ii) (requiring physician to perform pulmonary function testing on exposed person).

### B. Constitutionality

While I agree with the plurality that section 90.010(f) was applied retroactively in this case, I specifically disagree with the plurality's reasoning and conclusion with respect to the constitutionality of section 90.010(f) as applied because I believe this case fully satisfies the criteria for finding retroactive applications of the law to be constitutional as set out in the Texas Supreme Court's recent opinion in *Robinson. See* 335 S.W.3d at 147–50 (holding that Civil Practice and Remedies Code Chapter 149, limiting certain corporation's successor liability for personal injury claims based on asbestos exposure, violated prohibition against retroactive laws contained in Texas Constitution article I, section 16 when applied to bar suit by worker diagnosed with mesothelioma seeking to recover for damages caused by exposure to asbestos).

In *Robinson*, the supreme court, after reviewing its prior vested rights jurisprudence, stated,

> We think our cases establish that the constitutional prohibition against retroactive laws does not insulate every vested right from impairment, nor does it give way to every reasonable exercise of the Legislature's police power; it protects settled expectations that rules are to govern the play and not simply the score, and prevents the abuses of

7

legislative power that arise when individuals or groups are singled out for special reward or punishment. No bright-line test for unconstitutional retroactivity is possible. Rather, in determining whether a statute violates the prohibition against retroactive laws in article I, section 16 of the Texas Constitution, *courts must consider three factors in light of the prohibition's dual objectives: the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings; the nature of the prior right impaired by the statute; and the extent of the impairment.* The perceived public advantage of a retroactive law is not simply to be balanced against its relatively small impact on private interests, or the prohibition would be deprived of most of its force. There must be a compelling public interest to overcome the heavy presumption against retroactive laws. To be sure, courts must be mindful that statutes are not to be set aside lightly. This Court has invalidated statutes as prohibitively retroactive in only three cases, all involving extensions of statutes of limitations. But courts must also be careful to enforce the constitutional prohibition to safeguard its objectives.

*Id.* at 145–46 (citations omitted) (emphasis added). The court emphasized that, under the above test, "changes in the law that merely affect remedies or procedure, or that otherwise have little impact on prior rights, are usually not unconstitutionally retroactive." *Id.* at 146.

In this case, with respect to the first *Robinson* factor—the nature and strength of the public interest served by the statute—the legislature's statement of purpose and factual findings make it clear that the legislature enacted Chapter 90 specifically in response to an "asbestos litigation crisis," which it found to be "costly to employers, employees, litigants, and the court system." Act of May 16,

8

2005, 79th Leg., R.S., ch. 97, § 1(f)–(g), 2005 Tex. Gen. Laws 169, 169. The legislature cited the fact that "hundreds of thousands of lawsuits alleging asbestos-related disease have been filed throughout the United States" and that "[i]n the period from 1988 to 2000, more lawsuits alleging asbestos-related disease were filed in Texas than in any other state." *Id.* § 1(c)–(d). The legislature also noted that "[t]housands of asbestos lawsuits are pending in Texas courts today," and it contended that the "crush of asbestos litigation has been costly to employers, employees, litigants, and the court system." *Id.* § 1(e)–(f). The legislature found that "more than 70" companies had declared bankruptcy "due to the burden of asbestos litigation," and the legislature cited estimates that "between 60,000 and 128,000 American workers" had "lost their jobs as a result of asbestos-related bankruptcies and that eventually 423,000 jobs" would "be lost due to asbestos-related bankruptcies." *Id.* § 1(g).

The legislature stated that it enacted Chapter 90 not only to protect companies that are commonly sued for asbestos-related injuries and their employees, but also to protect "the right of people with impairing asbestos-related . . . injuries to pursue their claims for compensation in a fair and efficient manner through the Texas court system, while at the same time *preventing scarce judicial and litigant resources from being misdirected by the claims of individuals who have been exposed to asbestos . . . but have no functional or physical*

9

*impairment from asbestos-related . . . disease.*" *Id.* § 1(n), 2005 Tex. Gen. Laws at 170 (emphasis added). The legislature found that persons who were not "functionally or physically impaired by any asbestos-related illness" and who had brought asbestos-related lawsuits had "severely hamper[ed] the ability of seriously ill claimants to seek redress in the courts." *Id.* § 1(h), 2005 Tex. Gen. Laws at 169. The court stated that "[t]hose claimants who have had their day in court often find that the value of their recovery is seriously reduced when the company against whom the judgment was rendered files bankruptcy due to the weight of asbestos litigation brought by unimpaired claimants." *Id.*, 2005 Tex. Gen. Laws 169–70. Thus, in contrast to Chapter 149, the Texas Legislature made clear its intent in enacting Chapter 90 through extensive legislative findings. Significantly, the supreme court in *Robinson* acknowledged the legislative findings made in support of Chapter 90 in distinguishing Chapter 90 from Chapter 149, at issue in *Robinson*. *See* 335 S.W.3d at 149 ("The Legislature has recognized the severity of [the asbestos litigation] crisis in another context [Chapter 90], but it did not do so in enacting House Bill 4 and Chapter 149.").

Thus, I would conclude that, as evidenced by the Texas Legislature's findings, the legislature enacted Chapter 90 to serve a "compelling public interest" that overcomes "the heavy presumption against retroactive laws." *Id.* at 146. Consideration of the remaining Robinson factors—the nature of the prior right

impaired by the statute and the extent of the impairment—does not alter my conclusion that the Emmites' prior right to sue Union Carbide for damages for Joseph's wrongful death was not insulated from impairment by the constitutional prohibition against retroactive laws and that the legislature's exercise of its police power to bar recovery by heirs of a decedent for wrongful death in a case such as this was reasonable. *See id.* at 145–46.

Chapter 90 became effective on September 1, 2005, three months after Joseph's death but over one year before the Emmites filed suit. Accordingly, the Emmites were required to file a complying report once they filed their wrongful-death lawsuit. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 90.006 (Vernon 2011) (requiring, in action filed after effective date of Chapter 90, claimant to serve report complying with section 90.003 not later than 30th day after defendant answers or enters appearance). It is undisputed that, during the last month of his life, Joseph could not undergo pulmonary function testing and that Joseph was deceased at the time that Chapter 90 became effective.[4] It is also undisputed that, prior to the enactment of Chapter 90, and at the time of Joseph's death, the Emmites would not have been required to file a report including pulmonary

---

[4] In its briefing, Union Carbide "does not dispute that [Joseph] had a diagnosis of asbestosis; . . . and that, given his advanced dementia" and other conditions, "pulmonary function testing during [Joseph's] last few months of life was likely unobtainable." The record before us also establishes that at the time Joseph died, breathing tests were not required to bring claims like those asserted by the Emmites.

11

function testing results to pursue their wrongful-death claims. Thus, I recognize that the enactment of Chapter 90 impaired the Emmites' right to pursue their wrongful-death claims.

However, many of the factors considered by the supreme court in *Robinson* in regard to the nature of the claimants' rights are not present in the instant case. For example, in *Robinson*, the supreme court specifically noted that the legislature had enacted Chapter 149 with the specific intent to extinguish pending claims against a single defendant. *See* 335 S.W.3d at 148. The court also noted that, at the time the legislature enacted Chapter 149, the Robinsons had already filed suit. *See id.* at 130. Thus, in *Robinson*, Chapter 149 operated to strip litigants of their right to pursue "mature" claims that were already filed and pending. *See id.* at 148. The court also characterized the Robinsons' recovery as "more predictable," emphasizing that the injury at issue was "mesothelioma," such an injury was a "uniquely asbestos-related disease," and the record evidence reflected that the "claims had a substantial basis in fact." *Id.*

Here, although it is not a dispositive consideration, the Emmites' claims were not yet pending on the date that Chapter 90's reporting requirements became effective. *See Satterfield v. Crown Cork & Seal Co.*, 268 S.W.3d 190, 207–08 (Tex. App.—Austin 2008, no pet.) ("[T]he Legislature may not retroactively extinguish or eliminate accrued *and pending* causes of action, either by procedural

changes such as shortening statutes of limitation, or by substantive changes, such as creating new affirmative defenses") (emphasis added).

More significantly, the Emmites' wrongful-death claims are based on statute rather than common law. *See Robinson*, 335 S.W.3d at 135 (recognizing that "an analysis of the retroactive effect" of particular statute "on common law claims and statutory claims presents different considerations"). And, under the facts of this case, the wrongful death statute upon which the Emmites rely is invoked here to provide *only* for recovery by the heirs of a deceased asbestos worker who showed no functional or physical impairment even colorably due to asbestosis while showing significant impairment due to the disabilities of old age; who had no shortened life span as a provider for his family due to asbestosis; and who had no medical bills attributable to asbestosis at the time of his death, in direct contravention of the purpose of the statute as stated by the Texas Legislature in its findings. Specifically, Chapter 90 was enacted to protect persons "with impairing asbestos-related . . . injuries" by "preventing scarce judicial and litigant resources from being misdirected by the claims of individuals who . . . have no functional or physical impairment from asbestos-related disease." Act of May 16, 2005, § 1(n), 2005 Tex. Gen. Laws at 170. Thus, I am compelled to conclude that this suit falls into the category of those lawsuits that "severely hamper[] the ability of seriously ill claimants to seek redress in the courts." *Id.* § 1(h), 2005 Tex. Gen. Laws at 169.

13

In my mind, therefore, allowing this suit to proceed undermines the precise compelling state purpose for which Chapter 90 was enacted.

I also note that, in contrast with the record evidence in this case, the claimant in *Robinson* suffered from mesothelioma, a fatal disease invariably associated with exposure to asbestos, while Joseph suffered from multiple infirmities attributable to his advanced age, his history of smoking, and other causes, as well as "possible asbestosis," diagnosed only a month before his death. He had never been treated for any pulmonary disease that called into question his past work with asbestos or indicated the need for a pulmonary function test, nor is there any indication that he was functionally or physically impaired by asbestos-related disease until, at the earliest, one month before his death at age eighty-five. Thus, although asbestosis is an asbestos-related impairment, I do not share the plurality's view that the record before us demonstrates that the Emmites' claims have a substantial basis in fact. Rather, I believe that the record raises legitimate questions as to whether the Emmites, if allowed to proceed with their claims, would ultimately prevail. At a minimum, I think that, unlike the record considered by the supreme court in *Robinson*, the record before us does not demonstrate that the Emmites' wrongful-death claims have "a substantial basis in fact" for which their ultimate recovery is "predictable." *See* 335 S.W.3d at 148.

Finally, I believe that the reporting requirements imposed by Chapter 90 can be fairly characterized as a change in law that "merely affect[s] remedies or procedure," namely the right of heirs of an asbestos worker to recover damages for the functional or physical impairment of the deceased, rather than substantive vested rights. *Id.* at 146. In sum, I do not think that section 90.010(f)'s requirements that persons claiming functional or physical impairment due to an asbestos-related disease be required to show (1) that "pulmonary function testing has been performed on the exposed person," (2) that the testing has been interpreted by the physician making the report, (3) that the physician has concluded the exposed person has "bilateral pleural disease or bilateral parenchymal disease caused by exposure to asbestos," and (4) that the physician making the report has "concluded that the exposed person has asbestos-related . . . physical impairment comparable to the impairment the exposed person would have had if the exposed person met the criteria set forth in Section 90.003" place an unconstitutional hurdle on claimants seeking asbestos funds simply because the law is applied retroactively to bar the damage claims of heirs of a claimant who showed no functional or physical impairment ascribable to asbestosis until immediately prior to his death, who had no medical bills more than colorably due to asbestosis, and whose ability to provide for his family was not hindered by a shortened lifespan or by lingering disease due to asbestos exposure. *See* TEX. CIV. PRAC. & REM. CODE ANN.

15

§ 90.010(f).  Nor do I think the application of section 90.010(f) in this case to bar the Emmites' wrongful death suit "disturbs settled expectations" in the same way that the application of Chapter 149 extinguished any and all pending claims against a single corporate defendant in *Robinson*, including those of the plaintiff, an asbestos worker suffering from mesothelioma who had filed suit prior to the enactment of the law.  *See Robinson*, 335 S.W.3d at 148–49.  In my view, at the time of Joseph Emmite's death, his family had no reasonable expectation of recovering damages under Chapter 90, as he had not been diagnosed with asbestosis at any time during his long life prior to his diagnosis of "possible asbestosis" one month before his death and he suffered many of the infirmities of old age.

I would hold that Chapter 90, as applied to the Emmites' claims, does not violate article 1, section 16 of the Texas Constitution. Accordingly, I would overrule the constitutional challenge raised by the Emmites in their appellees' brief and reverse the order of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Jennings and Sharp.

A majority of the justices of the Court voted in favor of reconsidering the case en banc. TEX. R. APP. P. 49.7.

The en banc court on reconsideration consists of Chief Justice Radack and Justices Jennings, Keyes, Higley, Bland, Sharp, and Brown.

Justice Jennings, writing for the En Banc Court, joined by Justices Higley and Sharp.

Justice Keyes joins parts I, II, III, and IV of the En Banc Opinion.

Justice Bland, concurring in the judgment, joined by Chief Justice Radack and Justice Brown.

Justice Keyes, dissenting from the judgment.

Justices Massengale and Huddle not sitting.